**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

WORLD TRADE CENTER PROPERTIES LLC,
1 WORLD TRADE CENTER LLC,
2 WORLD TRADE CENTER, LLC,
3 WORLD TRADE CENTER LLC, and
4 WORLD TRADE CENTER LLC,

          Plaintiffs,

v.

GREAT LAKES REINSURANCE (UK) PLC,
CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON SYNDICATES NUMBERED 33, 1003,
2003, 1208, 1243, 0376, 1225, 1212, 79, 506, 2791,
QBE INSURANCE (EUROPE) LTD. F/K/A QBE
INTERNATIONAL INSURANCE LTD., and
INDUSTRIAL RISK INSURERS,

          Defendants.

10 CV 1642 (AKH)
ECF Case

This Action Relates to:
In re September 11 Litigation
21 MC 101

---

### MEMORANDUM OF LAW IN SUPPORT OF
### THE QBE GROUP's MOTION FOR PARTIAL[1] SUMMARY JUDGMENT

BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP

SCOTT S. KATZ, ESQ. (admitted *pro hac vice*)
skatz@butlerpappas.com
Florida Bar No.: 0709476
777 S. Harbour Island Boulevard, Suite 500
Tampa, Florida  33602
Telephone:    (813) 281-1900
Facsimile:    (813) 281-0900

Attorneys for Defendants QBE Insurance (Europe) Limited
f/k/a QBE International Insurance Ltd. and Certain
Underwriters at Lloyd's London Syndicates Numbered
1212, 79, 506, and 2791

---

[1] In the event this Court grants the Aviation Defendants' pending Renewed Motion for Collateral Setoff, *World Trade Center Properties LLC, et al. v. United Airlines, Inc. et al.*, 08 CV 3719, Doc. 153 (Nov. 9, 2011), and finds that the WTCP Plaintiffs have no uninsured tort damages, this Motion would become a dispositive Motion for Final Summary Judgment.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ...........................................................................................................................

    I.      THE RIGHT OF PRIORITY IS NOT TRIGGERED UNLESS THE
            WTCP PLAINTIFFS HAVE UNINSURED TORT DAMAGES,
            BECAUSE THE POLICY LANGUAGE, "ANY UNINSURED LOSS
            OR DAMAGE RESULTING FROM THE EXHAUSTION OF
            LIMITS," UNAMBIGUOUSLY REFERS TO UNINSURED LOSSES
            OR DAMAGES THAT ARE LEGALLY RECOVERABLE, I.E.,
            TORT DAMAGES. ......................................................................................

            A.    The policy's language is not express enough to modify the
                    default application of the *made whole doctrine*, which awards
                    an insured a portion of the insurer's subrogation recovery only
                    to the extent the insured has uninsured tort damages, because
                    the policy language is merely a restatement of the common law
                    *made whole doctrine.* ...............................................................

                  1.    The policy unambiguously references tort damages,
                        because it merely restates the default *made whole
                        doctrine*, which contemplates only tort damages. ....................

                  2.    The phrase "any uninsured loss or damage resulting
                        from the exhaustion of limits" is not express enough to
                        modify the default application of the common law *made
                        whole doctrine.* ...........................................................

            B.    The policy language unambiguously references tort damages,
                      because any undefined reference to "loss" or "damage" within
                      a subrogation provision is commonly understood to reference
                      tort damages. .........................................................................

    II.     INTERPRETING THE POLICY LANGUAGE, "ANY UNINSURED
            LOSS OR DAMAGE RESULTING FROM THE EXHAUSTION OF
            LIMITS," TO REFER TO ANYTHING OTHER THAN UNINSURED
            TORT DAMAGES WOULD LEAD TO AN ILLOGICAL RESULT,
            BECAUSE IT WOULD EFFECTIVELY INCREASE THE POLICY
            LIMIT WITHOUT AN INCREASE IN PREMIUM, AND BECAUSE
            IT WOULD DISCOURAGE THE INSURER FROM PURSING
            SUBROGATION. ...........................................................................

CONCLUSION ..................................................................................................................

# TABLE OF AUTHORITIES

**Cases**

*Allianz Ins. Co. v. Lerner*, 416 F.3d 109 (2d Cir. 2005). ..................................................................

*Ametex Fabrics v. Just in Materialz*, 140 F.3d 101 (2d Cir. 1998). ..................................................

*Barnes v. Indep. Auto. Dealers Ass'n Health & Welfare Benefit Plan*,

      64 F.3d 1389 (9th Cir. 1995). ..................................................................................

*Berry v. St. Peter's Hosp.*, 678 N.Y.S.2d 674 (N.Y. App. 1998). ......................................................

*Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590 (N.Y. 1956). .......................................

*Birch v. Fire Ins. Exchange*, 122 P.3d 696 (Utah App. 2005). ...........................................................

*Cont'l W. Ins. Co., v. Swartzendruber*, 570 N.W.2d 708 (Neb. 1997). .............................................

*Currier, McCabe & Assocs., Inc. v. Maher*, 906 N.Y.S.2d 129 (N.Y. App. Div. 2010). ..................

*Cutting v. Jerome Foods*, 993 F.2d 1293 (7th Cir. 1993). ..................................................................

*In re El-Roh Realty Corp.*, 902 N.Y.S.2d 727 (N.Y. App. Div. 2010). ...............................................

*Fasso v. Doerr*, 903 N.E.2d 1167 (N.Y. 2009). ..................................................................................

*Fireman's Fund Ins. Co. v. TD Banknorth Ins. Agency Inc.*, 644 F.3d 166 (2d Cir. 2011) ..............

*First Nat'l Bank v. Hansen*, 267 N.W.2d 367 (Wis. 1976). .................................................................

*Fla. Farm Bureau Ins. Co. v. Martin*, 377 So. 2d 827 (Fla. 1st DCA 1979).  .................................

*Global Int'l Marine, Inc. v. US United Ocean Servs., LLC*

      2011 WL 2550624 (E.D. La. 2011). .......................................................................

*Glover v. Nationwide Mut. Fire Ins. Co.*, 676 F. Supp. 2d 602 (W.D. Mich. 2009) ........................

*Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742 (N.Y. 2005). .........................................................

*Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608 (2d Cir. 2001). ...................................

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76 (2d Cir. 2002). ........................

*Lovelace v. Krauss*, 876 N.Y.S.2d 377 (N.Y. App. Div. 2009)..........................................

*Mazzaferro v. RLI Ins. Co.,* 50 F.3d 137 (2d Cir. 1995)..........................................

*Morgan Stanley Group Inc. v. New England Ins. Co*., 225 F.3d 270 (2d Cir. 2000) .......................

*Muller v. Society Ins.*, 750 N.W.2d 1 (Wis. 2008)..........................................

*Newmont Mines, Ltd. v. Hanover Ins. Co*., 784 F.2d 127 (2d  Cir. 1986). ..........................................

*NML Capital v. Republic of Arg*., 621 F.3d 230 (2d Cir. 2010). ..........................................

*Revson v. Cinque & Cinque, P.C*., 221 F.3d 59 (2d Cir. 2000)..........................................

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc*., 754 F. Supp. 2d 616 (S.D.N.Y. 2010). ...................

*Robinson v. United States*, 80 U.S. 363 (1871). ..........................................

*Sapiano v. Williamsburg Nat'l Ins. Co*., 33 Cal. Rptr. 2d 659 (1994)..........................................

*SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Props., LLC*, 2008 WL 2358882

      (S.D.N.Y. June 10, 2008), *aff'd* 2009 WL 2243837 (2d Cir. 2009) ..........................................

*Stancil v. Erie Ins. Co*., 740 A.2d 46 (Md. App. 1999). ..........................................

*Tampa Port Auth. v. M/V Duchess*, 65 F. Supp. 2d 1299 (M.D. Fla. 1997)..........................................

*Travis v. Rialto Furniture Co*., 220 A.2d 179 (R.I. 1966). ..........................................

*Wachter v. Kim*, 82 A.D.3d 658 (N.Y. App. Div. 2011). ..........................................

*White v. Cont'l Cas. Co*., 878 N.E.2d 1019 (N.Y. 2009)..........................................

*Willard v. Auto. Underwriters, Inc*., 407 N.E.2d 1192 (Ind. App. 1980). ..........................................

*Winkelmann v. Excelsior Ins. Co*., 650 N.E.2d 841 (N.Y. 1995). ..........................................

## <u>Other Authorities</u>

16 Couch, Insurance 2d § 16.1 [rev. ed.]. ..........................................

23 N.Y. Jur. 2d, Contribution, Indemnity and Subrogation, § 3..........................................

Federal Rule Civil Procedure 56(c). ..........................................

## PRELIMINARY STATEMENT

This declaratory judgment action arises from the property damage settlement entered between several of the plaintiffs in the 21 MC 101 Master Calendar and the Aviation Defendants. The QBE Group[2] was among the settling plaintiffs in that case. Shortly after the settlement was reached, the WTCP Plaintiffs[3] filed this lawsuit against the QBE Group, alleging a contractual right of priority to some of the settlement recoveries in the property damage settlement. It was later stipulated that the WTCP Plaintiffs are alleging entitlement to $13,892,510.93, i.e., the amount of the property damage settlement that is attributable to insurance payments made by the QBE Group to the WTCP Plaintiffs for damages arising from the 9/11 catastrophe.

The QBE Group's insurance payments to the WTCP Plaintiffs were issued pursuant to insurance policies that followed the WilProp 2000 policy form ("WilProp form"). In the subject action, the WTCP Plaintiffs contend that they are entitled to the $13,892,510.93, because the subrogation provision of the WilProp form grants the WTCP Plaintiffs priority over any subrogation recovery to the extent they have "any uninsured loss or damage resulting from the exhaustion of limits."

However, the facts of this case do not trigger the priority language, because the WTCP Plaintiffs have not established the existence of any uninsured damages.[4] In an attempt to establish uninsured damages, the WTCP Plaintiffs stretch the interpretation of the terms "loss or

---

[2] The QBE Group consists of QBE Insurance (Europe) Ltd. f/k/a QBE International Insurance Ltd. and Certain Underwriters at Lloyd's, London Syndicates Numbered 1212, 79, 506, and 2791.

[3] The WTCP Plaintiffs consist of World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC.

[4] Subrogation recoveries are generally divided in one of three ways: (1) priority to the insured, (2) priority to the insurer, or (3) pro rata. In this case, the QBE Group does <u>not</u> dispute that the policy gives priority to the insured. At issue is merely the type of uninsured damages that may trigger the insured's priority.

damage" to mean policy-defined damages, to wit: those damages that could have been covered under the policy had the WTCP Plaintiffs purchased more coverage.  This interpretation is unreasonable and not supported by the plain language of the policy which, when read in context, and in light of subrogation concepts, unambiguously references legally recoverable tort damages.

Significantly, the priority provision is not triggered unless and until the WTCP Plaintiffs' claims in the underlying lawsuit against the Aviation Defendants are resolved.  In order to recover under the policy's priority provision, there must be a judicial determination of damages in excess of the insurance proceeds already paid to the WTCP Plaintiffs.  Additionally, the Aviation Defendants' remaining insurance coverage must be insufficient to satisfy the WTCP Plaintiffs' judgment.[5]  Then, and only then, will the WTCP Plaintiffs be able to assert priority over the QBE Group's property damage settlement proceeds. *See Fasso v. Doerr*, 903 N.E.2d 1167, 1170 (N.Y. 2009) (holding an insurer's subrogation recovery is unaffected when the tortfeasor's remaining liability insurance gives the insured an adequate source of recovery); *see also Muller v. Society Ins.*, 750 N.W.2d 1, 20 (Wis. 2008) (holding the insured's right of priority did not apply when the tortfeasor's available assets exceeded the insured's total claim).  Moreover, should it be determined that the WTCP Plaintiffs have already been compensated for all legally recoverable tort damages, then the WTCP Plaintiffs have no priority right, and this

---

[5] It is the QBE Group's position that even if the WTCP Plaintiffs could establish uninsured tort damages, the uninsured damages must also be uncompensated.  That is, the WTCP Plaintiffs must be unable to fully collect on a judgment against the Aviation Defendants in order to trigger the contractual priority provision at issue.  Upon information and belief, the Aviation Defendants have approximately $2.3 billion in liability insurance remaining.  Therefore, in order to prevail in this action, the WTCP Plaintiffs must establish legally recoverable tort damages in excess of $6.4 billion, i.e., the $4.1 billion already collected in insurance proceeds combined with the $2.3 billion in liability insurance proceeds available from the Aviation Defendants.

declaratory judgment action is likewise over.[6]

In advance of a judicial determination as to the WTCP Plaintiffs' damages, the QBE Group requests this Court enter partial summary judgment regarding the meaning of the priority provision.  Based on the plain language of the WilProp form, as well as the context in which the priority provision must be read, the phrase "any uninsured loss or damage" unambiguously references legally recoverable tort damages.  Accordingly, this Court should find the contractual priority is not applicable unless and until the WTCP Plaintiffs establish uninsured tort damages.

---

[6] As the pending Renewed Motion for Collateral Setoff by the Aviation Defendants shows, the WTCP Plaintiffs have no legally recoverable tort damages for which they have not already been compensated via insurance proceeds.  See The Aviation Defendants' Memorandum of Law in Support of Their Renewed Motion for Collateral Setoff Against WTCP's Claims Pursuant to N.Y. CPLR 4545(c) and for Summary Judgment Dismissing WTCP's Damages Claims, *In re September 11 Litigation*, 21 MC 101, Doc. 1570 (Nov. 9, 2011).  In the event this Court finds the WTCP Plaintiffs have priority to the extent they have uninsured policy-defined damages, discovery with regard to those damages and a hearing in this action would then become necessary.

**ARGUMENT**

Summary judgment is appropriate only when all the submissions taken together show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In the context of a contract dispute, summary judgment is proper when the contractual language is unambiguous, and susceptible to only one reasonable interpretation. *Ametex Frabrics v. Just in Materials*, 140 F.3d 101, 107 (2d Cir. 1998).

In this case, the WTCP Plaintiffs allege that the WilProp form gives them a contractual priority over a certain portion of the QBE Groups' property damage settlement proceeds. However, the WilProp form requires the existence of "any uninsured loss or damage resulting from the exhaustion of limits," in order for the contractual priority to be triggered. When read in context, this phrase can only reasonably be interpreted to require the existence of uninsured, legally recoverable tort-based damages. Additionally, interpreting the phrase to reference anything other than uninsured tort damages would lead to an illogical result.

**I.     THE RIGHT OF PRIORITY IS NOT TRIGGERED UNLESS THE WTCP PLAINTIFFS HAVE UNINSURED TORT DAMAGES, BECAUSE THE POLICY LANGUAGE, "ANY UNINSURED LOSS OR DAMAGE RESULTING FROM THE EXHAUSTION OF LIMITS," UNAMBIGUOUSLY REFERS TO UNINSURED LOSSES OR DAMAGES THAT ARE LEGALLY RECOVERABLE, I.E., TORT DAMAGES.**

When interpreting insurance policy provisions, the policy language is to be construed in accordance with New York law. *SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Props., LLC*, 2008 WL 2358882, *2 (S.D.N.Y. June 10, 2008), *aff'd* 2009 WL 2243837 (2d Cir. 2009). The intentions of the parties, as well as the plain meaning of the language therein, should therefore control. *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 115 (2d Cir. 2005). Moreover, "[i]nsurance policies should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." *Newmont*

*Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986).

If the policy language is unambiguous, the plain language controls.  *See Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005), *quoting Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 591 (N.Y. 1956) ("mere assertion by one that the contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact").  Whether a policy provision is unambiguous is a question of law for the court.  *White v. Cont'l Cas. Co*., 878 N.E.2d 1019, 1021 (N.Y. 2007).

Under New York law, a provision is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no <u>reasonable</u> basis for difference of opinion."  *Revson v. Cinque & Cinque, P.C*., 221 F.3d 59, 66 (2d Cir. 2000) (emphasis added).  In other words, a provision is unambiguous when it has only one meaning when viewed <u>objectively</u>.  *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (emphasis added).

Here, the policy language, "any uninsured loss or damage resulting from the exhaustion of limits," unambiguously refers to uninsured tort damages.  That is, when read in context, the language is not express enough to modify the default *made whole doctrine*, which contemplates only legally recoverable tort-based damages.

    **A.**    **The policy's language is not express enough to modify the default application of the *made whole doctrine*, which awards an insured a portion of the insurer's subrogation recovery only to the extent the insured has uninsured tort damages, because the policy language is merely a restatement of the common law *made whole doctrine*.**

New York's common law *made whole doctrine* requires an insurer to forgo its subrogation rights to the extent the sources of recovery are inadequate to fully compensate the

insured and make the insured "whole."  *See Fasso v. Doerr*, 903 N.E.2d 1167 (N.Y. 2009);

*Winkelmann v. Excelsior Ins. Co.*, 650 N.E.2d 841 (N.Y. 1995).  In this case, the "Subrogation"

provision in the WilProp forms states as follows:

> B.  Subrogation.
>
> > 1.  In the event of any payment under this policy, the insurer, where legally permitted and where loss payments under the primary insurance are not detrimentally affected, shall be subrogated to the extent of such payment to all the Insured's rights of recovery thereof.  The insured shall execute all papers required and shall do anything that may be necessary at the expense of the Insurer to secure such right.  The Insurer will act in concert with all other interests concerned, i.e., the Insured and any other Insurer(s) participating in the payment of any loss as primary or excess insurers, in the exercise of such rights of recovery.  If any amount is recovered as a result of such proceedings, the net amount recovered after deducting the costs of recovery shall be distributed first to the Insured in reimbursement for the deductible amount retained and for **any uninsured loss or damage resulting from the exhaustion of limits** under this policy or primary or excess policy(ies).  The balance shall be divided between the remaining interests concerned in the proportion of their respective interests.  If there should be no recovery, the expense of the proceedings shall be borne proportionately by the interests instituting the proceedings.

WilProp form, sec. VII.B.1 (Scott S. Katz Declaration, Ex. A) (emphasis added).  When the

terms in the Subrogation provision are given their commonly understood meanings, the policy

language at issue in this action merely restates the common law *made whole doctrine*.

> **1.      The policy unambiguously references tort damages, because it merely restates the default *made whole doctrine*, which contemplates only tort damages.**

The principles of the *made whole doctrine* are presumed applicable to the distribution of

subrogation recoveries, unless the policy expressly modifies the common law rules. *See SR Int'l*

*Bus. Ins. Co. Ltd.,* 2008 WL 2358882 at *11.  The default *made whole doctrine* gives the insured

priority over any recovery to the extent the insured has not been "made whole."  Being "made

whole" is defined in terms of tort damages, meaning an insured is "whole" once he has been

compensated for the entire amount of legally recoverable tort-based damages. *See Global Int'l Marine, Inc. v. US United Ocean Servs., LLC*, 2011 WL 2550624, *17 (E.D. La. 2011) ("[I]n light of the fundamental purposes of subrogation, the measure of wholeness must be the amount of damages to which the insured is legally entitled, not simply the amount sought by the insured."); *see also Tampa Port Auth. v. M/V Duchess*, 65 F. Supp. 2d 1299, 1301-02 (M.D. Fla. 1997) (holding a jury verdict quantifying legally recoverable damages is conclusive of the amount that would fully compensate insured); *Travis v. Rialto Furniture Co.*, 220 A.2d 179, 181 (R.I. 1966) (holding an insured who recovers tort damages from the tortfeasor is presumptively made whole from that recovery).

For example, in *Birch v. Fire Insurance Exchange*, 122 P.3d 696 (Utah App. 2005), the Court of Appeal of Utah specifically addressed the definition of "made whole." In that case, some neighborhood children started a fire on the insured's property. *Id.* at 697. The fire was extinguished when a plane dropped fire retardant on the property. *Id.* However, the retardant contained a dye that caused additional damage. *Id.* Full replacement cost of the damaged property was paid by the insurer, minus the insured's $500.00 deductible. *Id.* The insurer then sought subrogation, and ultimately settled its claim for 95% of the amounts paid. *Id.* The parties stipulated the 5% reduction reflected the depreciated value of the property at the time it was destroyed. *Id.* at 697-98. The insurer then gave its insured $475, or 95% of its deductible. *Id.*

In *Birch*, the insured brought suit against his own insurer, claiming he was entitled to full reimbursement of his $500 deductible. *Id.* He further claimed the *made whole doctrine* required him to be made whole before the insurer could recover, and he had not been "made whole," because the deductible was not reimbursed in full. *Id.* In support of this argument, the insured cited to several cases defining the *made whole doctrine* with language such as "full

compensation," "completely compensated," "made whole for any portion," and "full extent of the loss." *Id.* at 699.  More specifically, the insured argued that the focus of the *made whole doctrine* is not on legally recoverable tort-based damages; but rather, it is on the total loss sustained. *Id.*

The *Birch* court rejected this argument and instead agreed with the insurer, who argued "the inquiry concerning the appropriate portion of the recovery from the tort-feasors' insurer to be paid to [the insured] should focus on the maximum recovery available in tort law rather than in light of the contractual replacement cost." *Id.*  The *Birch* court held that once the contractual obligations of the insurer had been satisfied, contractual damages were no longer at issue. *Id.* 699-700.  When determining whether the insured had been made whole, the court also asked whether the amount of tort damages exceeded the amount of insurance proceeds already received. *Id.* at 700.  In so doing, the *Birch* court held that whether an insured has been made whole is determined by asking whether the insured has been compensated for all legally recoverable tort damages. *Id.*

Since the *made whole doctrine* is a default rule, contract interpretation begins with a presumption that the *made whole doctrine* applies.  Additionally, as demonstrated by the cases above, the *made whole doctrine* contemplates only tort damages.  Therefore, contract interpretation of provisions relating to compensation for uninsured damages should begin with a presumption that the language refers to uninsured tort-based damages.

Here, the Subrogation provision of the WilProp form states that the net subrogation recoveries go first to the insured "for any uninsured loss or damage resulting from the exhaustion of limits under this policy or primary or excess policy(ies)."  This phrase conforms with the common law principles of the *made whole doctrine,* which give the insured a priority right to the

8

extent it has uninsured, legally recoverable tort damages.   In other words, no tortured interpretation is necessary, because the phrase is easily read to comport with the default *made whole doctrine*.   Moreover, interpreting the phrase in light of the presumption that the common law *made whole doctrine* applies, <u>requires</u> presuming that the terms "loss" and "damage" reference legally recoverable tort-based damages.   As such, the phrase should be interpreted as a restatement of common law, which requires the WTCP Plaintiffs to establish the existence of uninsured, legally recoverable tort-based damages.

2.   **The phrase "any uninsured loss or damage resulting from the exhaustion of limits" is not express enough to modify the default application of the common law *made whole doctrine*.**

Since the *made whole doctrine* is the default rule and gives an insured priority only to the extent it has uninsured tort damages, any interpretation of the WilProp form starts with the assumption that the insured's priority rights apply only to the extent the insured has uninsured tort damages.   In order to trump the default *made whole doctrine*, the policy language must be clear and explicit.   *SR Int'l Bus. Ins. Co. Ltd.,* 2008 WL 2358882, at *11 (holding the contractual language trumps equitable subrogation and the *made whole doctrine*, so long as the language is clear and explicit); *see also Fireman's Fund Ins. Co. v. TD Banknorth Ins. Agency Inc.*, 644 F.3d 166, 169-70 (2d Cir. 2011) (applying Connecticut law) (holding the *made whole doctrine* is a default rule that the parties may abrogate by "express terms in the contract to that effect."); *Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1394 (9th Cir. 1995) (holding *made whole doctrine* is a "gap-filler" used in the absence of a clear contractual provision to the contrary); *Cutting v. Jerome Foods*, 993 F.2d 1293, 1297 (7th Cir. 1993) (explaining *made whole doctrine* is applied when parties fail to address the issue clearly). In this case, the WilProp form did not expressly and explicitly expand that priority right in order to overcome the default application of common law principles, because the disputed phrase can

9

reasonably be read as merely restating the default *made whole doctrine*.

In the WilProp form, the wording at issue is surrounded by restatements of common law. Since all the other sentences in the Subrogation provision are restatements of common law principles, it is reasonable to interpret the disputed phrase as also being a restatement of the common law.

The Subrogation provision of the WilProp form begins with the following three sentences:

> In the event of any payment under this policy, the insurer, where legally permitted and where loss payments under the primary insurance are not detrimentally affected, shall be subrogated to the extent of such payment to all the Insured's rights of recovery thereof.  The insured shall execute all papers required and shall do anything that may be necessary at the expense of the Insurer to secure such right.  The Insurer will act in concert with all other interests concerned, i.e., the Insured and any other Insurer(s) participating in the payment of any loss as primary or excess insurers, in the exercise of such rights of recovery.

WilProp form, sec. VII.B.1.  These beginning three sentences simply act to incorporate common law principles and industry customs into the terms of the insurance contract.  This language makes no modifications to the parties' common law rights.

The fourth sentence of the Subrogation provision gives the insured a right of priority in certain circumstances:

> If any amount is recovered as a result of such proceedings, the net amount recovered after deducting the costs of recovery shall be distributed first to the Insured in reimbursement for the deductible amount retained and for any uninsured loss or damage resulting from the exhaustion of limits under this policy or primary or excess policy(ies).

WilProp form, sec. VII.B.1.  If the phrase "any uninsured loss or damage" within this sentence is interpreted as referencing those losses recoverable in tort, then this sentence is also a restatement of the common law *made whole doctrine*.

10

The next sentences are the following:

> The balance shall be divided between the remaining interests concerned in the proportion of their respective interests.  If there should be no recovery, the expense of the proceedings shall be borne proportionately by the interests instituting the proceedings.

WilProp form, sec. VII.B.1.  These sentences also restate common law principles.

Given that the sentences leading up to and immediately following the disputed phrase are restatements of common law, it is reasonable to interpret the disputed phrase as also restating common law principles.  Stated differently, it would be <u>un</u>reasonable to pluck one sentence or "phrase" out of the entire provision, and apply an interpretation totally different than the generally applicable law, especially when no other sentences modify the common law.

To the extent the WTCP Plaintiffs argue that the use of the word "any" in the phrase "any uninsured loss or damage" modifies the common law, such an argument is without merit.  Simply adding the word "any" does not make the phrase clear and express enough to indicate a change from the common law definition of uninsured damages.  In *Willard v. Automobile Underwriters, Inc.*, 407 N.E.2d 1192, 1193 (Ind. App. 1980), the court analyzed whether the policy language was express enough to allow the insurer to proceed with subrogation despite the fact the insured had not yet been made whole.  The policy language stated "the company shall be entitled, to the extent of such payment, to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery . . . ."  *Id.*  The court in *Willard* held that even though the language stated the insurer had the right to *any* settlement or judgment, this was not clear and unequivocal enough to overcome the application of the *made whole doctrine*.  *Id.*  Similarly, referring to "any loss or damage" in the WilProp form does not unequivocally modify the commonly understood references to tort damages.

11

If the subject insurance policy, as written, can be reasonably read as a restatement of the *made whole doctrine*, a modification from a commonplace interpretation requires the use of language that cannot also be read as a restatement of the *made whole doctrine*. *See Cont'l W. Ins. Co. v. Swartzendruber*, 570 N.W.2d 708, 712 (Neb. 1997) ("Because the contractual right of subrogation in Continental Western's policy is merely a statement of the usual equitable rights, which would have existed in any event in the absence of a contract, equitable principles of subrogation control this case."); *Fla. Farm Bureau Ins. Co. v. Martin*, 377 So. 2d 827, 830 (Fla. 1st DCA 1979) (holding contractual clause did not appear to grant any rights other than those already existing under the common law); *Sapiano v. Williamsburg Nat'l Ins. Co.*, 33 Cal. Rptr. 2d 659, 661 (1994) (although subrogation clauses are placed in policies, those provisions typically add nothing to the rights of subrogation arising by law).

It is only by a total foreclosing of the possibility that default principles apply, that a modification can truly be considered express, clear, and explicit.   Since both subrogation principles and the default *made whole doctrine* define "uninsured loss or damage" by reference to tort damages, the drafter of an insurance policy must expressly indicate a contrary meaning whenever such a contrary interpretation is intended.   *See also Glover v. Nationwide Mut. Fire Ins. Co.*, 676 F. Supp. 2d 602, 613 (W.D. Mich. 2009) (placing the burden of establishing priority rights on the party seeking to avoid the application of the default *made whole doctrine*). Here, the WTCP Plaintiffs' insurance broker drafted the WilProp form.   Plaintiffs' broker's failure to use language that explicitly altered the common law, compels the use of the common law *made whole doctrine*.   Thus, the WTCP Plaintiffs' priority right only is a factor <u>if</u> it has incurred uninsured tort-based damages (which it has not).

**B.**     **The policy language unambiguously references tort damages, because any undefined reference to "loss" or "damage" within a subrogation provision is commonly understood to reference tort damages.**

In addition to presuming the policy language comports with the default *made whole doctrine*, the words "loss" and "damage" should be interpreted as a reference to tort damages by virtue of the fact the terms lie within the Subrogation provision itself.  Words and phrases should not be viewed in isolation; rather, the entire policy should be considered as a whole.  *Wachter v. Kim*, 82 A.D.3d 658 (N.Y. App. Div. 2011); *Lovelace v. Krauss*, 876 N.Y.S.2d 377, 378 (N.Y. App. Div. 2009) ("It is an elementary rule of contract construction that clauses of a contract should be read together contextually in order to give them meaning.").  In this case, the phrase "any uninsured loss or damage resulting from the exhaustion of limits" cannot be viewed in a vacuum.  Instead, the plain language must be viewed in light of the provision in which it is located.

The headings within an insurance policy are relevant to the interpretation of its provisions.  *Int'l Multifoods Corp. v. Commercial Union Ins. Co*., 309 F.3d 76, 85 (2d Cir. 2002); *Mazzaferro v. RLI Ins. Co*., 50 F.3d 137, 140 (2d Cir.1995) ("A contract of insurance must be read as a whole, including any introductory clause or heading, to determine the intent of the parties.").  Here, the disputed phrase is set forth within the "Subrogation" provision of the WilProp form:

B. <u>**Subrogation.**</u>

1.   In the event of any payment under this policy, the insurer, where legally permitted and where loss payments under the primary insurance are not detrimentally affected, shall be subrogated to the extent of such payment to all the Insured's rights of recovery thereof.  The insured shall execute all papers required and shall do anything that may be necessary at the expense of the Insurer to secure such right.  The Insurer will act in concert with all other interests concerned, i.e., the Insured and any other Insurer(s) participating in the payment of any loss as primary or excess insurers, in

13

the exercise of such rights of recovery.  If any amount is recovered as a result of such proceedings, the net amount recovered after deducting the costs of recovery shall be distributed first to the Insured in reimbursement for the deductible amount retained and for **any uninsured loss or damage resulting from the exhaustion of limits** under this policy or primary or excess policy(ies).  The balance shall be divided between the remaining interests concerned in the proportion of their respective interests.  If there should be no recovery, the expense of the proceedings shall be borne proportionately by the interests instituting the proceedings.

WilProp form, sec. VII.B.1 (emphasis added).  Had the phrase been located within a provision dealing with coverage or the adjustment of claims, a different definition might be appropriate.  However, when interpreting the meaning of the Subrogation provision, the words and phrases should be interpreted with subrogation principles in mind.  This is because while contract interpretation requires that unambiguous words be given their plain language meaning, the plain language meaning to be attributed is the meaning as seen by a reasonably intelligent person, who has examined the context of the entire integrated agreement, and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular industry, trade, or business.  *Int'l Multifoods Corp. v. Commercial Union Ins. Co*., 309 F.3d 76, 83 (2d Cir. 2002); *SR Int'l Bus. Ins. Co., Ltd*., 2008 WL 2358882, at *2.

Additionally, when industry usage of a term or phrase establishes a commonly understood definition, that definition is applied in contract interpretation, unless the parties explicitly indicate there is to be some other meaning.  *Hugo Boss Fashions, Inc. v. Fed. Ins. Co*., 252 F.3d 608, 617-18 (2d Cir. 2001); *see also NML Capital v. Republic of Arg.*, 621 F.3d 230, 241 (2d Cir. 2010) ("Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary.") (citing *Robinson v. United States*, 80 U.S. 363, 366 (1871)).  Since the WilProp form did not define the terms used in the Subrogation provision, the commonly understood definitions,

as used in the subrogation industry, apply.

Subrogation is the principle by which an insurer, having paid its insured, steps into the shoes of its insured, so that the insurer may recover from the third party legally responsible for the loss. 16 Couch, Insurance 2d § 16.1 [rev. ed.]; 23 N.Y. Jur. 2d, Contribution, Indemnity and Subrogation, § 3. By its very definition, a subrogation recovery encompasses only legally recoverable tort damages, because only such damages can be recovered from a tortfeasor. Therefore, when contemplating subrogation, losses covered under the policy are no longer relevant. The only damages relevant in the subrogation field are legally recoverable tort damages. For this reason, in the subrogation context, any reference to a "loss" or "damage" that is not further defined is commonly understood to reference legally recoverable damages, i.e., tort damages.

Since the word "loss" or "damage" by itself references tort damages, the word "tort" need not be read into the policy in order for this Court to find the priority provision unambiguously references tort damages.[7] In fact, a review of New York case law illustrates that when discussing the apportionment of subrogation recoveries, New York courts often refer to uninsured losses or damages without further definition. From context, it is clear that the references are to legally recoverable tort damages. For example, in *Winkelmann*, the New York Court of Appeals affirmed the appellate court's holding that "inasmuch as plaintiffs' loss was greater than the indemnity by Excelsior, they could maintain a claim against Hockins for the difference . . . ." *Winkelmann*, 650 N.E.2d at 843. In other words, the court held the difference between the total loss and the insurance proceeds received could be sought via a lawsuit against the tortfeasor.

---

[7] It is anticipated that the WTCP Plaintiffs will argue that the QBE Group is attempting to re-write the policy by inserting the word "tort" before the phrase "loss or damage." For the purpose of making the record abundantly clear, the QBE Group is not asking the Court to make any additions or modifications to the policy language. Rather, the policy language, as written, unambiguously references tort damages.

Since only legally recoverable damages can be sought via such a lawsuit, this statement can only be true if the total loss is defined by the total amount of legally recoverable tort damages. Therefore, the uninsured losses in *Winkelmann* were understood to be uninsured losses recoverable in tort -- despite the fact the term "loss" was never so specifically defined.

The court in *Winkelmann* also stated that the insurer's subrogation rights do not affect the insured's "right to sue for the amount of the loss remaining unreimbursed." *Id.* at 844. If the insured could sue for the "loss remaining unreimbursed," then the unreimbursed losses must be legally recoverable tort damages. Additionally, the court commented that the insured "retains the right to pursue recovery for its outstanding losses." *Id.* Again, if all the outstanding losses could be pursued via recovery, then by definition the outstanding losses must be legally recoverable tort damages. The court ended its opinion by stating: "It will be time enough to determine plaintiffs' rights vis-à-vis defendant's when and if it is determined that the third-party tortfeasor is unable to pay the remainder of their loss." *Id.* at 845. This is yet another example of the New York Court of Appeals impliedly defining the "remainder" of the loss by reference to legally recoverable tort damages, because a tortfeasor cannot be required to pay anything other than tort damages.

Furthermore, in *Berry v. St. Peter's Hospital*, 678 N.Y.S.2d 674, 678 (N.Y. App. 1998), the appellate court equated the term "losses" to "possible provable damages" when it said:

> In the case at bar, there is adequate evidence in the record that the liability coverage of the remaining defendants is substantially less than the total possible provable damages. [The] Supreme Court was clearly presented with a situation where the potential existed that the sources of recovery ultimately available might be inadequate to fully compensate the insureds for their losses.

In *Berry*, the insureds risked not being fully compensated for their losses, because the remaining defendants had insufficient assets. It then logically follows that if the defendants had sufficient

16

assets, the insureds could have been fully compensated.   This is only possible, if fully compensating the insureds for their losses meant compensating them for the total amount of their legally recoverable tort damages.

These cases demonstrate that the terms "loss" and "damage" have definite and precise meanings when dealing with subrogation claims.  The words need not be further defined in order to indicate a reference to tort damages, because per the industry definition, that is the commonly understood meaning.

In this case, the WilProp form does not define the terms, nor indicate that anything other than the commonly understood definitions should apply.   Accordingly, in the WilProp form, the phrase, "any uninsured loss or damage resulting from an exhaustion of limits," unambiguously references uninsured tort damages, because no definition contrary to the commonly understood meaning was provided.  Thus, the priority language is not triggered until the WTCP Plaintiffs establish the existence of uninsured, legally recoverable tort damages.

**II.  INTERPRETING THE POLICY LANGUAGE, "ANY UNINSURED LOSS OR DAMAGE RESULTING FROM THE EXHAUSTION OF LIMITS," TO REFER TO ANYTHING OTHER THAN UNINSURED TORT DAMAGES WOULD LEAD TO AN ILLOGICAL RESULT, BECAUSE IT WOULD EFFECTIVELY INCREASE THE POLICY LIMIT WITHOUT AN INCREASE IN PREMIUM, AND BECAUSE IT WOULD DISCOURAGE THE INSURER FROM PURSING SUBROGATION.**

The phrase "any uninsured loss or damage" must be interpreted as a reference to tort damages in order to avoid illogical results.  *See Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (applying New York law) (explaining that when interpreting insurance policies, absurd results should be avoided).   Interpreting the phrase in question to encompass damages as defined in the "policy coverage" provisions effectively rewrites the entire policy.  Such an outcome cannot have been intended.

Property insurance is purchased through the payment of premiums.  Those premiums are adjusted depending on the value of the property, as well as the policy limits selected by the insured.  The higher the policy limits, the more of a risk the insurer is taking on, and thus, the higher the premiums to shoulder that risk.  If the insured is given priority over subrogation recoveries to the extent there are uninsured "policy-defined" damages, the insured is then receiving the benefit of coverage for which it had the option of purchasing, but chose not to. This is neither a reasonable nor equitable interpretation of the policy language in light of the business purposes behind insurance policies.  *Cf. Stancil v. Erie Ins. Co*., 740 A.2d 46 (Md. App. 1999) (holding there is no inequity in allowing subrogation, and requiring the insured to bear the loss when the insured fails to adequately insure his property); *First Nat. Bank of Columbus v. Hansen*, 267 N.W.2d 367, 370 (Wis. 1976) (noting subrogation is based on equity, and is permitted when the rights of those seeking subrogation have greater equity than those who oppose it).

Additionally, interpreting the WilProp language to give the WTCP Plaintiffs priority to the extent they have uninsured "policy-defined" damages negates the policy limit.  The policy limit states the maximum amount of "policy-defined" damages recoverable.  If additional "policy-defined" damages were recoverable via the Subrogation provision, then the policy limit would not truly be a limit on "policy-defined" damages as stated.  Such an interpretation renders the policy internally inconsistent, and must be avoided.  *See Rex Med. L.P. v. Angiotech Pharm. (US), Inc*., 754 F. Supp. 2d 616, 624 (S.D.N.Y. 2010) (noting parties are not free to interpret a contract in a way that frustrates its purpose); *Currier, McCabe & Assocs., Inc. v. Maher*, 906 N.Y.S.2d 129, 131 (N.Y. App. Div. 2010) (holding particular words should not be considered in isolation, but should be viewed in light of the contractual obligation as a whole); *In re El-Roh*

*Realty Corp.*, 902 N.Y.S.2d 727, 729 (N.Y. App. Div. 2010) (holding that a contract must be interpreted so as to give effect to, not nullify, its general or primary purpose).

Furthermore, if the language "any uninsured loss or damage" is interpreted to encompass more than just tort damages, the QBE Group would have no incentive to pursue subrogation at all, because the entire recovery would go to the WTCP Plaintiffs. *See also Muller v. Society Ins.*, 750 N.W.2d 1, 20 (Wis. 2008) (refusing to give the insured priority when the tortfeasor has sufficient assets, because such a ruling "would discourage subrogees from pursuing their subrogation rights."). This would allow the responsible third party to avoid being held accountable – which is also against public policy. An objective view of the policy does not allow for an interpretation that gives the QBE Group subrogation rights, and then provides a disincentive for exercising those rights, all the while permitting the responsible party to avoid the legal repercussions of its actions. Such a result is not reasonable and certainly not intended.

When viewed in context, and in light of the overall purpose of the insurance policy, the only reasonable interpretation of the insurance policy requires the existence of uninsured tort damages before the WilProp form's subrogation priority language is triggered. Since there is only one reasonable interpretation, this Court should rule the insurance policy is unambiguous, and that the phrase, "any uninsured loss or damage resulting from the exhaustion of limits," requires that the WTCP Plaintiffs have legally recoverable, uninsured tort damages <u>before</u> the alleged priority is triggered.[8]

---

[8] If the Court were to find the insurance policy is susceptible to more than one interpretation and is therefore ambiguous, the QBE Group fully anticipates that a presentation of extrinsic evidence will establish a record that definitively demonstrates that the parties intended the contractual priority to be no greater than the priority established under common law principles. As such, the policy would still require the WTCP Plaintiffs to establish the existence of uninsured tort damages before being able to recover. Furthermore, the WTCP Plaintiffs' mere assertion that they will succeed at trial against the Aviation Defendants is not enough. As previously noted, in order to trigger the priority provision, the WTCP Plaintiffs must obtain a judicial determination of damages in excess of $6.4 billion, i.e., the $4.1billion

**CONCLUSION**

For the reasons stated herein, this Court should find the phrase "any uninsured loss or damage" can only be reasonably interpreted to reference legally recoverable, uninsured tort damages.  Accordingly, the QBE Group is entitled to a partial summary judgment.

WHEREFORE, the QBE Group respectfully requests that this Court grant partial summary judgment in its favor.[9]

Respectfully submitted this 2nd day of December, 2011.

BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP


/s/ Scott S. Katz
_____
SCOTT S. KATZ, ESQ. (admitted *pro hac vice*)
Florida Bar No.:  0709476
skatz@butlerpappas.com
777 S. Harbour Island Boulevard
Suite 500
Tampa, Florida  33602
Telephone:     (813) 281-1900
Facsimile:      (813) 281-0900

Attorneys for Defendants QBE Insurance (Europe) Limited f/k/a QBE International Insurance Ltd. and Certain Underwriters at Lloyd's London Syndicates Numbered 1212, 79, 506, and 2791

---

already received in insurance proceeds combined with the $2.3 billion in liability insurance proceeds that are believed to be available from the Aviation Defendants.

[9] Should the Court grant the Aviation Defendants' pending Renewed Motion for Collateral Setoff, a finding in favor of the QBE Group on this Motion for Partial Summary Judgment would in fact completely resolve this Declaratory Judgment Action.

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with the CM/ECF system on December ___2__, 2011, which will automatically send electronic copies to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Scott S. Katz*

_____

SCOTT S. KATZ, ESQ.